**SO ORDERED.**

**SIGNED this 19 day of September, 2007.**

_____

**J. Rich Leonard**
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

**IN RE:**

       **LACY M. HENRY and**
       **JUDY B. HENRY,**
              **Debtors.**
                                             **Case No. 05-04620-8-JRL**
                                           **Chapter 11**

_____

       **BASIN ELECTRIC POWER COOPERATIVE,**
              **Plaintiff,**

       **v.**
                                             **Adversary Proceeding No.**
                                           **L-05-00262-8-AP**

       **LACY M. HENRY; JUDY B. HENRY;**
       **MPS GENERATION, INC.; MECHANICAL**
       **PLANT SERVICES, INC.; QUALIFIED PLANT**
       **SERVICES, INC.;**
              **Defendants,**

       **and**

       **LACY M. HENRY and JUDY B. HENRY,**
               **Third-Party Plaintiffs,**

       **v.**

       **ORMAT, INC., and CLIFFORD WADDELL,**
               **Third-Party Defendants.**

## ORDER

The matter before the court is the motion for summary judgment filed by Basin Electric Power Cooperative ("Basin") and the motion for summary judgment filed by Lacy M. Henry, Judy B. Henry, MPS Generation, Inc. ("MPSG"), Mechanical Plant Services, Inc. ("MPS"), and Qualified Plant Services, Inc. ("QPS") (hereinafter "Defendants"). On August 22-23, 2007, the court conducted a hearing on these motions in Wilmington, North Carolina.

## UNDISPUTED FACTS

1.      Basin is a North Dakota cooperative principally located in Bismarck, North Dakota, that provides electricity to its member cooperatives.

2.      MPSG is a North Carolina corporation principally located in Wilmington, North Carolina, and licensed to do business in the State of North Dakota.

3.      MPS is an administratively dissolved North Carolina corporation that was primarily engaged in constructing and repairing turbines.

4.      QPS is an administratively dissolved North Carolina corporation that was in the business of refurbishing rail cars.

5.      Lacy M. Henry is a resident of the State of North Carolina and the sole shareholder of MPSG and MPS.

6.      Judy B. Henry, wife of Lacy M. Henry,  is a resident of the State of North Carolina and the sole shareholder of QPS.

7.      MPSG shared payroll accounts and employees with MPS and QPS.

8.      On November 3, 2003, MPSG and Northern Border Pipeline Company ("Northern Border"), a Texas general partnership, entered into a Waste Heat Purchase Agreement.

2

9.      Under the Waste Heat Purchase Agreement, MPSG acquired the rights to purchase waste heat from four compressor stations on the Northern Border Pipeline. (initial sites 7, 9, 10 and 11).

10.     The Waste Heat Purchase Agreement also gave MPSG an option to acquire one or more of nine remaining sites (secondary sites 1, 2, 3, 4, 5, 6, 8, 12 and 13).

11.     On November 5, 2003, MPSG entered into an Engineering, Procurement and Construction Contract ("EPC Contract") with Basin, whereby MPSG agreed to furnish and install four waste heat recovery systems ("WHRS") at sites 7, 9, 10 and 11 for the purpose of generating electric power and energy.

12.     Mr. Henry formed MPSG for the purpose of performing the EPC Contract and related contracts with Basin.

13.     John Stephens, the initial director named in MPSG's articles of incorporation, believed that MPSG lacked the money and resources to take on the project with Basin.

14.     When MPSG was formed, no stock certificates were issued in exchange for capital.

15.     Aside from the Northern Border heat rights and easement, MPSG had no other known assets, such as patents or equipment, that Lacy Henry could identify in his deposition.

16.     MPSG did not file a tax return.

17.     MPSG never conducted director meetings..

18.     Grady Windham, accountant for MPSG and related entities, was unaware of any certified audit, review or bound statement for MPSG during its existence or the related entities since 1995.

19.      Mr. Henry had no knowledge of the directors and officers of MPSG.

3

20.     Mr. Henry admitted that he was the decision maker for MPSG, including the decision maker regarding the allocation of capital.

21.     Mr. Windham considered Powertec and Light Logix as "probably one and the same."

22.     Most of the bookkeeping for Powertec and Light Logix was handled through MPS.

23.     MPSG had no separate payroll account.

24.     QPS was the administrative entity for the other corporations, and payroll checks for the separate entities were made on one account entitled "Plant Services."

25.     There is little or no evidence that Judy Henry controlled MPSG.

26.     At the time that MPSG contracted with Basin, Mr. Henry was aware that MPS owed $1.4 million for delinquent withholding taxes for 2002 and 2003.

27.     MPS shared its employees with other related entities, such as MPSG.

28.     QPS was also delinquent in the approximate amount of $1.6 million for unpaid withholding taxes for the third quarter of 2000 and for all of 2002.

29.     The Henrys were delinquent on federal income taxes due from previous years.

30.     MPSG assigned Basin the waste heat rights to sites 7, 9, 10 and 11 pursuant to the Partial Assignment and Assumption Agreement between Basin and MPSG dated November 5, 2003.

31.     MPSG was required to complete its obligations under the EPC Contract within fourteen months of the written notice to commence construction.

32.     On November 5, 2003, MPSG and Basin also entered into an Operating and Maintenance Agreement, whereby MPSG agreed to operate and maintain the waste heat recovery systems on behalf of Basin for a period of ten years.

4

33.     The EPC Contract provided that each WHRS would include the ORMAT Energy Converter ("OEC") and balance of plant.

34.     Pursuant to the EPC Contract, each OEC was to be integrated with a Waste Heat Oil Heater ("WHOH") to produce electrical power.

35.     Under the EPC Contract, MPSG guaranteed that each WHRS would produce 5.726 MW of net power.

36.     Under the Operations and Maintenance Contract, if a WHRS failed to produce the guaranteed power, MPSG was liable to Basin for liquidated damages for the term of ten years.

37.     Pursuant to the EPC Contract, Basin agreed to pay MPSG a total of $28,900,000.00 in accordance with a Milestone Payment Schedule.

38.     The Milestone Payment Schedule describes the work to be completed for each milestone, the estimated time for each award, the documentation required, and the percentage of the contract price to be awarded.

39.     The Milestone Payment Schedule states that the first milestone consists of a direct payment to MPSG and an amount to be placed in an escrow account.

40.     Basin, MPSG, and Wells Fargo Bank entered into an Escrow Agreement.

41.     Basin deposited $2,052,000.00 in the escrow account at Wells Fargo Bank as required by the EPC Contract.

42.     On December 29, 2003, MPSG entered into a Supply Contract with Ormat, Inc., ("Ormat") whereby Ormat agreed to supply the process and conceptual design including the WHOH performance specifications; supply, transport, handle and insure the OECs from the port of origin to the four sites; and provide other ancillary services.

5

43.    MPSG submitted invoices for work completed pursuant to the Milestone Payment Schedule.

44.    Basin made payments to MPSG in excess of four million dollars  for milestones one through four.

45.    Mr. Henry authorized transfers of funds from MPSG to related entities, such as MPS, QPS, and Powertec, as well as to himself and Judy Henry.

46.    There were no loan agreements between MPSG and these related entities and individuals.

47.    Basin directed MPSG to acquire and assign to Basin sites 5 through 12 and paid MPSG $125,000.00 by wire transfer on March 31, 2004.

48.    On April 2, 2004, Basin made the fourth milestone payment under the EPC Contract by transferring $1,300,500.00 to MPSG.

49.    In April 2004, MPSG exercised its option with Northern Border and paid $437,000.00 to acquire the rights to seven of the remaining nine sites (sites 1, 3, 5, 6, 8, 12 and 13).

50.    During the spring of 2004, MPSG realized that there would be a power shortfall under the EPC Contract. While MPSG had guaranteed 5.726 MW of net power under the EPC Contract, Ormat had guaranteed 5.726 MW of "OEC power" under the Supply Contract.

51.    During the spring of 2004, Basin expressed dissatisfaction with the design of the WHOH, asserting that the proposed design far exceeded standard heat exchanger design and created an acid dew risk.

52.    By letter dated July 29, 2004, Basin notified MPSG that it would not accept the WHOH design.

6

53.     Basin, MPSG and Ormat met to consider various assignments, releases, and consents that would have resulted in Ormat constructing and owning the four waste heat facilities and selling the electricity to Basin.

54.     MPSG would not sign such assignments, releases, and consents.

55.     MPSG did not invoice Basin for the milestone five payment.

56.     MPSG invoiced Basin for the sixth milestone payment for mobilization.

57.     Basin refused to make milestone payment six.

58.     During the course of performing the EPC Contract, MPSG did not pay certain subcontractors and employees.

59.     A number of subcontractors filed mechanic's liens for nonpayment against certain sites subject to the Waste Heat Purchase Agreement between MPSG and Northern Border.

60.     Perigon Architectural and Engineering Associates, P.A., obtained a money judgment against MPSG.

61.     Northern Border terminated the Waste Heat Purchase Agreement with MPSG.

62.     In October 2004, the Internal Revenue Service filed a notice of levy against MPS for unpaid taxes for calendar years 2002 and 2003 in the amount of $1,400,601.54.

63.     MPSG did not construct any waste heat recovery systems.

64.     On December 12, 2004, Basin entered into a Power Purchase Agreement with an Ormat-related company, OREG 1, Inc. ("OREG 1").

65.     Under the Power Purchase Agreement, Basin assigned OREG 1 the waste heat rights to sites 7, 9, 10 and 11.

66.     OREG-1 built the sites and is now selling power to Basin.

67.     By letters dated February 8, 2005 and February 9, 2005, Basin formally gave notice that it was terminating the EPC Contract for its convenience.

68.     By the letter dated February 9, 2005, Basin demanded to audit MPSG's records.

69.     MPSG refused the audit.

70.     Upon Basin's cancellation for convenience, MPSG demanded Wells Fargo to distribute all of the escrow funds to MPSG.

### STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure is applicable to adversary proceedings. Fed. R. Bankr. P. 7056. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "When a motion for summary judgment is made and supported . . . , an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id. The facts must be viewed in the light most favorable to the non-moving party. Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## PROCEDURAL HISTORY

On February 24, 2005, Basin filed suit against MPSG, MPS, Light Logix, Inc., Lacy Henry, Judy Henry, and Keith Henry in the United States District Court for the District of North Dakota. Basin sought a preliminary injunction to enjoin MPSG from obtaining the funds held in escrow by Wells Fargo Bank. On March 21, 2005, the district court entered an order granting Basin's motion for a preliminary injunction and instructing Wells Fargo Bank to retain the funds held in escrow until further order of the court.

On June 13, 2005, Lacy and Judy Henry filed for relief in this court under Chapter 11 of the Bankruptcy Code. On September 15, 2005, Basin filed a complaint in this court against the Henrys claiming that they were the alter egos of MPSG. On November 15, 2005, the Henrys answered the complaint, asserting counterclaims against Basin and filing a third-party complaint against Ormat. On January 5, 2006, the court entered an order staying the North Dakota lawsuit filed against the Henrys and the corporate defendants. Basin was permitted to amend its complaint in the subject case to include claims against the other defendants.

Basin has amended its complaint twice. Basin's seconded amended complaint includes claims against Lacy Henry, Keith Henry, MPSG, MPS, and QPS. MPSG and the Henrys have filed counterclaims against Basin and third party claims against Ormat and Clifford Waddell. Both Ormat and Mr. Waddell have filed counterclaims against MPSG and the Henrys.

## ANALYSIS

Basin and the Defendants are moving for summary judgment on certain claims and counterclaims pending before the court. Specifically, Basin seeks summary judgment on its breach of contract claim against MPSG, its conversion claim against all Defendants, its claim for

declaratory relief, its claim to pierce the corporate veil of MPSG against Lacy and Judy Henry, and all counterclaims by MPSG and the Henrys against Basin.

The Defendants seek summary judgment on Basin's claim for breach of contract ( including specifically the issues of whether Basin is entitled to recoup the milestone payments and whether Basin is entitled to the escrow funds plus earnings on interest), Basin's claim for declaratory relief, MPSG/Henrys' counterclaim against Basin for breach of contract (including specifically the issues of whether MPSG is entitled to the escrow funds plus interest, the amount of milestone payment six, and the ten percent retainage held by Basin), Basin's claim of conversion, Basin's claim of piercing the corporate veil, Basin's dischargeability claims against Judy Henry, and whether MPSG/Henrys' counterclaims are meritorious or fail as a matter of law. The Defendants also move for summary judgment on Ormat's counterclaims against Judy Henry.[1]

The court first addresses the choice of law rules to be applied in this case. A federal court applies the choice of law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); New England Leather Co. v. Feuer Leather Corp., 942 F.2d 253, 255 (4th Cir. 1991). However, when a lawsuit is transferred from one federal court to another pursuant to 18 U.S.C. § 1404(a) for convenience of the witnesses, the transferee court applies the choice of law rules that the transferor court would have applied. Van Dusen v. Barrack, 376 U.S. 612, 632-37 (1964). Here, there was no convenience-of-the witness transfer; rather, this court stayed the action in North Dakota against the Henrys and the co-defendant corporations, finding that the claims could substantially deplete the Henrys' bankruptcy estate for other creditors. In re Henry, Case. No. 05-

---

[1]The Defendants' motion for summary judgment as to Ormat's counterclaims against Judy Henry will be addressed in a separate order along with Ormat's motion for summary judgment.

04620-8-JRL (Bankr. E.D.N.C. Jan. 5, 2006). The court then allowed Basin to amend its complaint to add additional defendants to the pending case. <u>Id.</u> Both Basin and the Defendants have cited choice of law rules of North Carolina in addressing the counterclaim for unfair or deceptive trade practices. The court will apply the choice of law rules of the forum state of North Carolina to this case.

## A.    <u>Basin's Breach of Contract Claim Against MPSG</u>

In its breach of contract claim, Basin asserts that it is entitled to recoup $3,795,916.59, representing the majority of the four milestone payments made to MPSG under the EPC Contract. In addition, Basin asserts that it is entitled to all funds in the escrow account. Both Basin and the Defendants have moved for summary judgment on these issues.

Under North Carolina law, "[t]he parties choice of law is generally binding on the interpreting court as long as they had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental public policy of the state or otherwise applicable law." <u>Torres v. McClain</u>, 535 S.E.2d 623, 625 (N.C. Ct. App. 2000). MPSG, a North Carolina corporation licenced to do business in North Dakota, contracted with Basin, a North Dakota cooperative principally located in Bismarck, North Dakota. The choice of law provision in the EPC Contract identifies North Dakota law as governing the agreement. The EPC Contract addresses the funds that were placed into escrow, and the escrow agreement was made in conjunction with the EPC Contract. The court will apply North Dakota law to Basin's breach of contract claim.

Under North Dakota law, "[t]he construction of a written contract to determine its legal effect is a question of law." <u>Lenthe Investments, Inc. v. Service Oil, Inc.</u>, 636 N.W.2d 189, 193 (N.D. 2001). "Contracts are construed to give effect to the mutual intention of the parties at the time of

11

contracting." Id. at 194. "The parties' intention must be ascertained from the writing alone if possible." Id. "The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless by the parties in a technical sense, or unless a special meaning is given them by usage, in which case the latter must be followed." N.D. Cent. Code § 9-07-09. "[S]everal contracts relating to the same matters between the same parties and made as parts of substantially one transaction are to be taken together." N.D. Cent. Code 9-07-07.

### 1.      Milestone Payments One through Four

It is undisputed that, by letters dated February 8, 2005 and February 9, 2005, Basin elected to terminate the EPC Contract under the cancellation for convenience provision. Specifically, the cancellation for convenience provision of the EPC Contract states the following:

> Owner shall have the right to cancel this Contract for its convenience at any time by written notice to Contractor. On the date of such cancellation stated in said notice, Contractor shall discontinue all Work pertaining to this Contract, shall place no additional orders and shall preserve and protect materials on hand purchased for or committed to this Contract. Upon such cancellation, Contractor shall be paid the earned portion of the total cost of all Work completed as of the date of cancellation, including the cancellation costs identified in any subcontract. Owner may, at its option, have those costs, which are reimbursable under this Section audited by either Owner's auditing staff or by independent certified public accountants selected by Owner.

EPC Contract, art. II, § 3, pt. C. Basin focuses on the terms "earned" and "work" and asserts that MPSG did not earn the ninety percent of milestone payments for work completed. "Work" is specifically defined in the EPC Contract as "the labor, equipment, supplies or materials and related services necessary to provide the Construction required by or reasonably inferable from the Contract." EPC Contract, art. II., § 3, pt. C. Basin asserts that, as a result of MPSG diverting milestone payments to other entities and individuals, MPSG only expended $639,433.31 towards

12

"work" under the EPC Contract and is only entitled to retain that amount. The Defendants dispute the amount that Basin alleges MPSG expended on work.

The court finds that the plain language of the EPC Contract resolves who is entitled to the ninety percent of the four milestone payments. MSPG contracted with Basin for a fixed contract price of $28,900,000.00 to be awarded pursuant to a Milestone Payment Schedule set forth at Appendix B of the EPC Contract. The Milestone Payment Schedule describes the work to be completed for each milestone, the estimated time for each award, the documentation required, and the percentage of the contract price to be awarded. It is undisputed that Basin paid ninety percent of the first four milestone payments to MPSG under the EPC Contract. The EPC Contract plainly states that MPSG will receive ninety percent of each milestone payment based upon the parties' mutual agreement of MPSG's progress. The pertinent language states as follows:

> The owner shall pay the Contractor for the Work performed based upon mutual agreement of the Contractor's progress. See Appendix B for Milestone Payment Schedule for conditions for payment of invoices (including retainage, escrowed funds and letter of credit). Invoices will be honored Net 15 days from invoice date if all conditions of payment have been met. Contractor shall submit to the Owner an invoice with appropriate documentation, of compensation due. Provided, however, that such approval shall not be deemed approval of the workmanship or materials; and provided further, that in estimating the amount of construction accomplished, consideration shall be given only to equipment and materials incorporated into the Project and equipment consideration shall be given only to equipment and materials incorporated into the Project and equipment and materials delivered to the site in accordance with approved shipping schedule. Only ninety percent (90%) of each such estimate approved during the construction of the Project shall be paid by the Owner to the Bidder prior to Completion of the Project. Upon completion by the Bidder of the construction of the Project, Owner shall inspect the Work performed hereunder and if he shall find the Work acceptable and all provisions hereunder fully performed, the Owner shall certify the balance found to be due the Bidder.

EPC Contract, art. III, § 1, ¶ (a). This provision of the EPC Contract makes clear that Basin had discretion in awarding milestone payments and that Basin was to consider whether the conditions

13

for payment had been met before honoring invoices under the Milestone Payment Schedule. It is implicit that, by approving milestone payments one through four under the EPC Contract, Basin was agreeing that the subject milestones had been achieved. Any other interpretation would render the Milestone Payment Schedule meaningless.

While the honoring of invoices does not constitute approval of MPSG's workmanship or materials under the EPC Contract, there are separate provisions of the contract for the removal and replacement of defective workmanship and materials and for remedying defaults. EPC Contract, art. II, § 6; art. V, § 1. Basin, however, elected to terminate the EPC Contract for convenience rather than for default.

There appears to be no North Dakota law specifically addressing how to interpret cancellation for convenience clauses. The court, therefore, will consider the decisions of other federal and state courts that have specifically addressed this type of contractual termination. Cancellation for convenience permits termination without cause. Harris Corp. v. Giesting & Assoc., 297 F.3d 1270, 1273 (11th Cir. 2002). "The general rule is that 'termination for convenience' clauses permit one party to terminate a contract, even in the absence of fault or breach by the other party, without suffering the usual financial consequences of breach of contract." Id. at 1272. That is the benefit of electing to terminate for convenience—the limitation of the contractor's rights against the owner.

Basin cites the case of Hydrothermal Energy Corp. v. United States, 26 Cl. Ct. 1091 (Cl. Ct. 1992) in support of its argument that reclamation of milestone payments is warranted following the termination for convenience. In the Hydrothermal Energy case, however, the applicable termination clause specifically stated that "if the total amount of allowable costs 'is less than the total payment

14

theretofore made to the Contractor, the Contractor shall repay to the Government the excess amount.'" Id. at 1105. There is no such provision here. Moreover, any audit that Basin is entitled to under the cancellation for convenience clause of the EPC Contract relates only to reimbursable costs of MPSG; whereas, ninety percent of the first four milestone payments had already been paid to MPSG and were subject to documentation upon invoice. EPC Contract, Art. II, § 3, Part C.

Where there is a termination for convenience, the owner is not entitled to liquidated damages and reimbursement for payments made to third parties. Fruin-Colnon Corp., et al v. Niagara Frontier Transp. Authority, 180 A.D.2d 222, 233 (N.Y.A.D.1992). In a case where the City of New York elected to terminate a contract for convenience, the court stated that the City could not counterclaim for expenses incurred as a result of the plaintiff's alleged default. Tishman Const. Corp., Inc. v. City of New York, 228 A.D.2d 292, 293 (N.Y.A.D. 1996). While the City was bound by the contractual provision that it had elected, the court stated that the City of New York could show that overpayments were made on a theory of fraud. Id.

Based on the foregoing, the court finds that Basin is bound by the termination for convenience provision of the EPC Contract and cannot seek reclamation of the four milestone payments under a breach of contract theory. Rather, any alleged overpayment can be argued under the separate count of fraud.

### 2.    Escrow Funds

The Milestone Payment Schedule states that milestone payment one consists of two components, including funds to be paid directly to MPSG and funds to be deposited into the EPC Escrow account. It is undisputed that Basin placed $2,052,000 into an escrow account with Wells Fargo Bank.

Basin urges the court to consider the full language of the Escrow Agreement and the EPC Contract in unison. Specifically, Basin points to the language of the paragraph entitled "Administration of the Escrow Account" and states that there was an intended plan for how the escrow account would operate. EPC Contract, p. 2, ¶3. The subject paragraph states that MPSG would be entitled to all funds in the escrow account if the four waste heat recovery systems passed the performance test by the deadline specified in the EPC Contract. Id. In the event one or more of the facilities passed the performance test, MPSG would receive a pro rata portion of the escrow funds based on the percentage of the four facilities meeting the performance test. Id.  For those facilities that did not meet the performance test, Basin would receive reimbursement from the escrow account for amounts expended in enabling all facilities to meet the performance test. Id. Thereafter, MPSG would receive anything remaining in the account. Id.  At the end of the paragraph, the Escrow Agreement specifically states:

> If Basin elects to terminate the EPC Contract for its convenience pursuant to Article II, Section 3 of Contractor's Proposal, Basin shall provide written notice of such fact to the Escrow Agent by United States Certified Mail return receipt requested. Upon receipt of such notice, the Escrow Agent shall wire transfer funds in the Escrow Account to MPSG in conformance with written instructions provided by MPSG.

Escrow Agreement, p. 3, ¶ 3. "A contract must be construed as a whole to give effect to each provision." Lenthe Investments, Inc. v. Service Oil, Inc., 636 N.W.2d 189, 194 (N.D. 2001). Taking the Escrow Agreement as a whole, it is clear that the above provision clearly applies in the event Basin elects to terminate the EPC Contract for convenience. It is undisputed that Basin elected to terminate the EPC Contract for its convenience. Failing to apply such provision in the specific situation that it was designed to address would render it meaningless.

Basin points to the EPC Contract where it states that no payment shall be due while MPSG

is in default. EPC Contract, Art. III, § 3. While it is undisputed that MPSG did not construct waste heat converter systems in the applicable time frame as contemplated by the EPC Contract, Basin did not pursue default remedies under the EPC Contract. EPC Contract, Art. V, § 1. Even if Basin had terminated the EPC Contract for default, Basin would have been obligated "to make a good faith effort to determine the underlying cause of the default." EPC Contract, Art. V, § 4. Specifically, the EPC Contract states that, if by making that good faith effort, "[Basin] believes that the primary cause of [MPSG's] default is the nonperformance of [MPSG's] prime vendor, [Basin] agrees that it will first exercise its rights under the letter of credit, prior to exercising the rights granted to it to utilize the retained funds and the escrowed funds." EPC Contract, Art. V, § 4 (emphasis added).

Basin must deal with the consequences of choosing to elect termination for convenience. Pursuant to the clear language of the Escrow Agreement, MPSG is entitled to the escrow funds plus earnings from interest. Accordingly, Basin's motion for summary judgment is denied, and the Defendant's motion for summary judgment is granted as to Basin's breach of contract claim. The court, however, instructs Wells Fargo Bank to hold the escrow funds plus earnings from interest until further order of the court after all claims have been adjudicated.

**B.**    **Basin's Claim of Conversion Against All Defendants**

Basin alleges the claim of conversion under North Dakota law against all of the Defendants. The application of North Dakota law is consistent with the North Carolina choice of law rule governing tort claims, which says that the state where the injury occurs is the situs of the claim. Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d, 849, 853-54 (N.C. 1988). Under this traditional rule of *lex loci delicti*, the place of injury is "the state where the last event necessary to make an actor liable for an alleged tort takes place." Brendle v. General Tile & Rubber Co., 408 F.2d

17

116, 117 n. 3 (4th Cir. 1969) (quoting Restatement of Conflict of Laws § 377 (1934)).  Any financial injury sustained from the alleged conversion would have occurred in North Dakota where Basin is principally located. *See* Hill-Rom Services, Inc. v. Verses Technology, Inc., No. 1:03CV12227, 2006 WL 1540851 at *12 (M.D.N.C.   Jun. 2, 2006) (Michigan substantive law applied to misrepresentation claim, as financial injury occurred in Michigan where defendant was based).

Both Basin and the defendants seek summary judgment on the claim of conversion. Basin asserts that, because MPSG transferred funds that it had received under the Milestone Payment Schedule to other entities and the individual defendants, Basin was wrongfully deprived of its property. Under North Dakota law, conversion is defined as "a tortious detention or destruction of personal property, or a wrongful exercise of dominion or control over the property inconsistent with or in defiance of the rights of the owner." Ritter Laber & Assoc., Inc. v. Koch Oil, Inc., 680 N.W.2d 634, 638 (N.D. 2004). "Claims for conversion may arise under the same facts as claims for breach of contract." Id. at 639. "Conversion requires an intent to exercise control or interfere with the use of property to such a degree as to require a forced sale of the plaintiff's interest in the goods to the defendant." Id. at 638-39.  "The gist of conversion is not in acquiring the complainant's property, but in wrongfully depriving the complainant of the property." Id. at 639.

Conversion would only work if the Defendants intentionally deprived Basin of its use of property; however, it was a mutual decision for Basin to make milestone payments to MSPG under the EPC Contract. The plain language of the EPC Contract states: "The owner shall pay the Contractor for the Work performed based upon mutual agreement of the Contractor's progress . . . Invoices will be honored Net 15 days from invoice date if all conditions of payment have been met." EPC Contract, Art. III, §1, ¶a (emphasis added). Thus, by honoring the invoices for milestone

18

payments one through four, Basin agreed that the conditions had been met for payment. Basin points to no provision in the contract that preserved Basin's interest in the milestone payments once payment was made. Because the milestone payments were no longer the property of Basin, the claim of conversion fails.

Based on the foregoing, the court denies Basin's motion for summary judgment and grants the Defendants' motions for summary judgment on Basin's claim of conversion.

### C.    Basin's Claim for Declaratory Relief

Basin seeks a judicial declaration that it is entitled to the funds in the escrow account. Basin and the Defendants have moved for summary judgment on this issue.  As noted in the court's analysis of Basin's breach of contract claim, the Escrow Agreement specifically addresses what would happen in the event Basin terminated the EPC Contract for convenience–MPSG would be entitled to the funds in the escrow account. Escrow Agreement, p.3, ¶ 3. It is undisputed that Basin elected to terminate the EPC Contract for convenience.

Based on the foregoing, the court denies Basin's motion for summary judgment on its claim for declaratory relief and grants the Defendant's motion for summary judgment. MPSG is entitled to the escrow funds plus earnings from interest.  Wells Fargo Bank is instructed to hold these funds until further order of the court after all claims have been adjudicated.

### D.    Basin's Claim Against the Henrys for Piercing the Corporate Veil of MPSG

Basin alleges a claim against the individual defendants, Lacy and Judy Henry, asserting that the corporate veil of MPSG should be pierced and the Henrys should be jointly and severally liable for all direct and consequential damages suffered by Basin. Basin's motion states that it is seeking summary judgment on this count against both individual defendants; however, Basin's memorandum

in support of summary judgment focuses on Lacy Henry only. The Defendants also move for summary judgment on Basin's claim of piercing the corporate veil.

MPSG is a North Carolina corporation. While North Carolina has not ruled definitively on the issue, federal courts considering the choice of law rules of North Carolina in the context of a piercing the corporate veil claim have concluded that "the North Carolina Supreme Court . . . would adopt the internal affairs doctrine and apply the law of the state of incorporation." Speedway Promoters, Inc. V. Hooter's of America, Inc., 123 F. Supp. 2d 956 (W.D.N.C. 2000); Dassault Falcon Jet Corp. v. Oberflex, Inc., 909 F. Supp. 345, 349 (M.D.N.C. 1995). This is not disputed by the parties.

Under North Carolina law, "when . . . the corporation is so operated that it is a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State, the corporate entity will be disregarded and the corporation and the shareholder treated as one and the same person . . . ." Henderson v. Security Mortg. & Finance Co., 273 N.C. 253, 260, 160 SE.2d 39, 44 (1968). To disregard the corporate entity under the instrumentality rule, the following elements must be met:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

B-W Acceptance Corp. v. Spencer, 268 N.C. 1, 9, 149 S.E.2d 570, 576 (1966). Factors that are considered in determining whether an individual exercises complete domination over a corporation

include: "(1) inadequate capitalization ('thin incorporation'); (2) non-compliance with corporate formalities; (3) complete domination and control of the corporation so that it has no independent identity; and (4) excessive fragmentation of a single enterprise into separate corporations." Glenn v. Wagner, 313 N.C. 450, 455, 329 S.E.2d 326, 330-31 (1985).

The court finds that Mr. Henry's own deposition testimony, deposition testimony of MPSG employees, and the Defendants' discovery responses demonstrate that Mr. Henry completely dominated MPSG. First, the court considers inadequate capitalization. MPSG was created in May 2003 for the Basin Project. Lacy Henry Deposition, p. 169. Lacy Henry was the sole shareholder, and no stock certificates were issued in exchange for capital. Defendants' Answer to Basin's Interrogatory 1. While MPSG had the Northern Border heat rights and easement, MPSG had no other known assets, such as patents or equipment. Lacy Henry Deposition, p. 170. At the time that MPSG contracted with Basin, Mr. Henry was aware that MPS owed $1.4 million for delinquent withholding taxes for 2002 and 2003. Id. at 190-192. QPS was also delinquent in the approximate amount of $1.6 million for unpaid withholding taxes for the third quarter of 2000 and for all of 2002. Id. at 212. Moreover, the Henrys were delinquent on their federal income taxes. Id. at 203. Basin paid over four million dollars in milestone payments to MPSG. Id. at 195-97. Mr. Henry authorized substantial transfers of these funds to related entities, such as MPS, QPS, and Powertec, as well as to himself and Judy Henry. Id. There were never any loan agreements between MPSG and the related entities and individuals. Id. at 172. John Stephens, the initial director named in MPSG's articles of corporation, testified at deposition that MPSG lacked the money and resources to take on the project with Basin. John Stephens Deposition, p. 115.

Mr. Henry's own deposition testimony and the deposition testimony of Mr. Windham

demonstrate that MPSG lacked corporate formalities. Henry had no knowledge of the directors or officer of the corporation. Lacy Henry Deposition, p. 169.  MPSG did not file a tax return. Id. at 171. There were never any formal shareholder meetings or minutes from such meetings. Id. at 172.  There were never any director meetings. Id. MPSG did not have a separate payroll account. Id. at 173. MPSG's accountant, Grady Windham, testified at deposition that no certified audit, review or bound statement had been prepared for the related entities since 1995. Grady Windham Deposition, p. 84.

Mr. Henry's own deposition testimony supports that he exercised control over MPSG so that it had no independent identity. While Mr. Henry had no knowledge of the directors and officers of MPSG, he testified that he was the decision maker for MPSG, including the decision maker regarding the allocation of capital. Lacy Henry Deposition p. 169-170. As noted above, Mr. Henry testified that he authorized the transfer of funds from MPSG to other entities and to himself and his wife. Id. at  195-197.

Finally, Mr. Windham's testimony supports that there was excessive fragmentation of the corporation. Mr. Windham, accountant for the related entities, testified that he considered Powertec and Light Logix as "probably one and the same." Grady Windham Deposition, p. 55. MPS shared its employees with the other related entities, such as MPSG. Id. at 65.  Most of the bookkeeping for Powertec and Light Logix went through MPS. Id. at 54-55. QPS was the administrative entity for the other related corporations, and payroll checks for these entities were made on one account entitled "Plant Services.". Id. at 60-61.

Considering the record as a whole and in the light most favorable to Mr. Henry, the court grants summary judgment in favor of Basin on the first element of the instrumentality rule. Mr.

22

Henry completely dominated MPSG, and there is no genuine issue of fact for trial regarding this issue. The remaining two elements regarding whether Mr. Henry used his control to commit fraud or wrong and whether the control caused injury to Basin are reserved for trial.

The court grants summary judgment for Judy Henry on the claim of piercing the corporate veil of MPSG. The record reflects that there is little or no evidence to support a claim of piercing the corporate veil against Judy Henry.  Accordingly, the claim against her is dismissed.

**E.      Basin's Claims Against Judy Henry for Exception to Discharge**

The Defendants seek summary judgment on Basin's claims against Judy Henry for exception to discharge, pursuant  to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 523(a)(6), and 727(a)(2)-(3). Because there are genuine issues of fact regarding Ms. Henry's intent and conduct, the court denies summary judgment as to these claims.

**F.      MPSG/Henrys' Counterclaim for Breach of Contract Against Basin**

MPSG alleges a counterclaim for breach of contract against Basin, asserting that Basin terminated the EPC Contract in bad faith and is therefore liable for MPSG's damages beyond the bounds of the cancellation for convenience provision. The Henrys allege an identical claim in the event that they are determined to be the alter ego of MPSG. As noted above, the contract  is governed by North Dakota law. EPC Contract, Art. VI, § 12. Specifically, MPSG asserts that it is entitled to: (1)  $2,052,000 held in escrow by Wells Fargo Bank plus earnings from interest; (2) milestone payment six in the amount of $1,445,000.00; and (3) $679,150, representing the 10% unpaid retainage held by Basin under the EPC Contract.

In the defense of Basin's breach of contract claim, MSPG and the Henrys argue  that Basin is bound by the cancellation for convenience provision in the EPC Contract and cannot recover

damages for any default. In support of their breach of contract claim, MPSG and the Henrys argue that MPSG is not bound by the cancellation for convenience provision because Basin terminated the contract for convenience in bad faith. At first blush, it appears that these two arguments are inconsistent and clash with traditional principles of contract law that one cannot rescind and enforce the same contract. <u>McKenzie v. Carte</u>, 385 S.W.2d 520, 537 n.18 (Tex. Civ. App. 1965); <u>Knaus Truck Lines v. Donaldson</u>, 235 Minn. 453, 51 N.W.2d 99 (Minn. 1952); <u>Troitino v. Goodman</u>, 225 N.C. 406,415, 35 S.E.2d 277, 283 (N.C. 1945). Yet, a closer reading of the applicable law surrounding termination for convenience reveals that it is entirely consistent to hold the owner to its election of termination for convenience and still seek damages for breach of contract for bad faith termination. "A termination for convenience provision allows the owner to terminate without regard to actual fault, but it comes at the price of waiving any claim for damages and instead requires overhead and profit." Stephen A. Hess, *Assessing Default Termination*, Construction Briefings No. 2006-2 (Feb. 2006). Thus, by electing to terminate a contract for convenience, the owner is intentionally relinquishing its right to collect damages from the contractor. <u>Id.</u> Where the owner terminates the contract for convenience in bad faith, the actual termination for convenience is a breach of contract and renders the terminating party liable for common law contract damages rather than the limited recovery due the contractor under the cancellation provision. <u>Rice Systems, Inc. v. United States</u>, 62 Fed. Cl. 608, 620 (Fed. Cl. 2004). "Termination for convenience clauses may not be used to shield the terminating party from liability for bad faith or fraud." <u>Harris Corp. v. Giesting & Assoc., Inc.</u>, 297 F.3d 1270, 1272-73  (11th Cir. 2002). MPSG and the Henrys are not attempting to rescind the termination for convenience provision; rather, they are asserting that the alleged bad faith act of terminating for convenience constituted a breach of contract to which Basin should be

held liable.

The court addresses MPSG's limited damages under the termination for convenience clause in the event the court concludes that termination was made in good faith. First, the court finds that MPSG is clearly owed the escrow funds and any earnings from interest pursuant to the Escrow Agreement, which specifically contemplates the transfer of escrow funds to MPSG in the event Basin terminates the contract for convenience. Escrow Agreement, p. 3, ¶3. Second, MSPG is limited to milestone payments one through four that were already made under the EPC Contract. The cancellation for convenience clause limits MPSG's recovery to "the earned portion of the total cost of all Work completed as of the date of cancellation" and any reimbursable costs subject to Basin's audit. EPC Contract, Art. II, § 3, pt. C. Under the EPC Contract, Basin was obligated to make a milestone payment if there was mutual agreement of MPSG's progress. EPC Contract, Art. III, § 1, ¶ (a). This was a condition of payment. While payments one through four met this condition of mutual assent, payment six did not. In addition, regarding any reimbursable costs under the termination for convenience provision, Basin had the right to request an audit. It is undisputed that MPSG denied such audit request. Payment six, therefore, will not be considered an earned portion of costs if the court finds that the termination for convenience was made in good faith.

In addition, the court finds that the retainage is not an earned portion of the costs or reimbursable amount under the termination for convenience provision. "Retainage is a portion of the contract price deliberately withheld to assure that contractor or subcontractor will satisfy its obligations and complete a project." C. Kelly Skrabak & Heather A. Jones, *The State of Retainage*, Construction Briefings No. 2005-4 (Apr. 2005). Under the plain language of the EPC Contract, MPSG was not entitled to the ten percent retainage unless MPSG completed the project under the

EPC Contract and Basin inspected the work to determine if all obligations had been performed. EPC Contract, Art. III, § 1, ¶ (a). It is undisputed that MPSG did not construct the waste heat recovery systems under the EPC Contract prior to Basin's termination for convenience. There was no completion and inspection of the project entitling MPSG to retainage. Even if the project had been completed and inspected, the Milestone Payment Schedule states that one million dollars of the retained amount would be transferred directly to a separate Operating and Maintenance escrow account to ensure performance under the Operating and Maintenance Agreement.

The court would rule on this counterclaim on summary judgment if the issue of bad faith was not in dispute. However, based on the record as a whole, the issue of whether Basin terminated the EPC Contract in bad faith is a genuine issue of material fact for trial. If termination for convenience was in bad faith, then the termination would constitute a breach of contract allowing MPSG to potentially recover more than it would under the termination for convenience clause. The court, therefore, denies Basin and the Defendants' motions for summary judgment as to this claim.

## G.    **MPSG/Henrys' Counterclaim Against Basin for Tortious Interference with Northern Border Contract and Ownership of Sites**

MPSG asserts that Basin tortiously interfered with the Waste Heat Purchase Agreement between MPSG and Northern Border. The Henrys have brought an identical counterclaim in the event they are determined to be the alter ego of MPSG. Both Basin and the Defendants have moved for summary judgment on this counterclaim.

Under the Waste Heat Purchase Agreement, MPSG acquired rights to waste heat produced at certain compressor stations on the Northern Border Pipeline. The Waste Heat Purchase Agreement also gave MPSG an option to acquire secondary sites if certain conditions were met.

Basin denied milestone payment six, and creditors placed liens on a number of sites subject to the Waste Heat Purchase Agreement. MPSG asserts that, as a result of Basin's alleged wrongful denial of payment six, MPSG lost all of its exclusive heat rights, including heat rights to sites that were not the subject of the EPC Contract.

MPSG has not specified whether it is pursuing this claim under North Carolina or North Dakota law. As noted above, the state where the injury occurred is the situs of the tort claim. Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d, 849, 853-54 (1988). This court has considered the place of injury when determining the substantive law applicable to a tortious interference with contract claim. Southern Produce Distributors, Inc. v. Friedman (In re Southern Produce Distributors, Inc.), No. 05-00013-8-AP at *9 (Bankr. E.D.N.C. Oct. 6, 2006). In Southern Produce, the court specifically considered where the alleged financial injury took place. Id. MPSG is a North Carolina corporation, and any financial injury would have taken place in North Carolina where the corporation is based. See Hill-Rom Services, Inc. v. Verses Technology, Inc., No. 1:03CV12227, 2006 WL 1540851 at *12 (M.D.N.C. Jun. 2, 2006).

To establish a claim of tortious interference with contract under North Carolina law, a plaintiff must show: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." Beck v. City of Durham, 154 N.C. App. 221, 232, 573 S.E.2d 183,191 (N.C. Ct. App.  2002).

Based on the record as a whole, the court finds that MPSG stated a claim for tortious interference with contract, and there remains genuine issues of material fact regarding the intent and

conduct of Basin in connection with the denial of milestone payment six. Accordingly, the court denies motions for summary judgment filed by Basin and the Defendants as to this counterclaim.

**H.    MPSG/Henrys' Counterclaim Against Basin for Unfair or Deceptive Trade Practices**

MPSG alleges a counterclaim against Basin for unfair or deceptive trade practice under North Carolina law. The Henrys have filed an identical counterclaim in the event they are found to be the alter ego of MPSG. Both Basin and the Defendants move for summary judgment on this counterclaim.

Basin asserts that MPSG's claim fails because North Carolina substantive law does not apply here. Because an action for unfair or deceptive acts or practices is the creation of statute, it is "neither wholly tortious nor wholly contractual in nature." Stetser v. TAP Pharmaceutical Products, Inc., 165 N.C.App. 1, 15, 598 S.E.2d 570, 580 (N.C. Ct. App. 2004). The North Carolina Court of Appeals has applied two different approaches for determining which state's law governs an unfair or deceptive trade practice claim under Chapter 75 of the North Carolina General Statutes. Id. Under the traditional approach, the law of the state where the injury is sustained governs the claim. United Virginia Bank v. Air-Lift Assoc., Inc., 79 N.C. App. 315, 321, 339 S.E.2d 90, 94 (N.C. Ct. App. 1986). Under the modern approach,  the  law of the state having the most significant relationship to the occurrence giving rise to the action governs the claim. Andrew Jackson Sales v. Bi-Lo Stores, Inc., 68 N.C. App. 222, 225, 314 S.E.2d 797, 799 (N.C. Ct. App. 1984). This court has applied the significant relationship test in determining which law should apply to unfair or deceptive trade practice claims. Southern Produce Distributors, Inc. v. Friedman (In re Southern Produce Distributors, Inc.), No. 05-00013-8-AP at *9 (Bankr. E.D.N.C. Oct. 6, 2006). This is consistent with the approach taken by the Fourth Circuit Court of Appeals and U.S. District Court for the Eastern

District of North Carolina when considering unfair or deceptive trade practice claims under North Carolina's choice of law rules. New England Leather Co. v. Feuer Leather Corp., 942 F.2d 253, 254- 56 (4th Cir. 1991); American Rockwool, Inc. v. Owen-Corning Fiberglass Corp., 640 F. Supp. 1411, 1430-31 (E.D.N.C. 1986).

Under the significant relationship test, the court considers "where the relationship between the parties was created and where it was centered." New England Leather Co., 942 F.2d at 256. MPSG contracted with Basin, a North Dakota corporation, to engineer, procure and construct four facilities for the purpose of generating electric power and energy. MPSG also contracted with Basin to operate and maintain the four facilities. The sites of the facilities were located along the Northern Border Pipeline in North Dakota and South Dakota. While not controlling for purposes of unfair or deceptive trade practice claims, the EPC Contract stated that it was governed by North Dakota law. The parties convened for a construction kickoff meeting in Bismarck, North Dakota. MPSG employees made visits to the four sites during the course of contract performance, and another meeting was held in Bismarck in the summer of 2004. While MPSG is a North Carolina corporation with its principal place of business in North Carolina, North Carolina is not where the relationship between Basin and MPSG was created or centered.

The court grants Basin's motion for summary judgment and denies the Defendants' motion for summary judgment as to MPSG/Henry's counterclaim for unfair or deceptive trade practices under North Carolina law. The counterclaim is dismissed because the claim was specifically made under Chapter 75 of the North Carolina General Statutes, which substantive law is inapplicable here. Because MPSG has not alleged a comparable claim under North Dakota law, the court will not entertain that issue.

29

## <u>CONCLUSION</u>

Based on the foregoing, the court GRANTS IN PART and DENIES IN PART the motions for summary judgment filed by Basin and the Defendants. Specifically, the court grants summary judgment in favor of Basin on the first element of control under the instrumentality test against Lacy Henry for piercing the corporate veil of MPSG. The court also grants summary judgment in favor of Basin on MPSG and the Henrys' counterclaim for unfair or deceptive trade practices under Chapter 75 of the North Carolina General Statutes. The court grants summary judgment in favor of the Defendants on Basin's breach of contract claim, Basin's claim of conversion, Basin's claim for declaratory relief, and Basin's claim against Judy Henry for piercing the corporate veil of MPSG. The court denies summary judgment against both Basin and the Defendants as to Basin's claims against Judy Henry for exception to discharge, the remaining two elements of the instrumentality test on Basin's piercing the corporate veil claim against Lacy Henry, MSPG and the Henrys' counterclaim for breach of contract as a result of the issue of bad faith termination, and MPSG and the Henrys' counterclaim for tortious interference with the Northern Border contract and ownership of sites.


END OF DOCUMENT