**SO ORDERED.**

**SIGNED this 19 day of September, 2007.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

IN RE:

    LACY M. HENRY and
    JUDY B. HENRY,
        Debtors.                    Case No. 05-04620-8-JRL
                                          Chapter 11

_____

    BASIN ELECTRIC POWER COOPERATIVE,
        Plaintiff,

    v.                                      Adversary Proceeding No.
                                          L-05-00262-8-AP

    LACY M. HENRY; JUDY B. HENRY;
    MPS GENERATION, INC.; MECHANICAL
    PLANT SERVICES, INC.; QUALIFIED PLANT
    SERVICES, INC.;
        Defendants,

    and

    LACY M. HENRY and JUDY B. HENRY,
        Third-Party Plaintiffs,

    v.

    ORMAT, INC., and CLIFFORD WADDELL,
        Third-Party Defendants.

## ORDER

The matter before the court is the motion for summary judgment filed by third-party defendant, Clifford Waddell. On August 23, 2007, the court conducted a hearing on this matter.

**UNDISPUTED FACTS**

1. Basin Electric power Cooperative ("Basin") is a North Dakota cooperative principally located in Bismarck, North Dakota, that provides electricity to its member cooperatives.

2. MPS Generation, Inc. ("MPSG") is a North Carolina corporation principally located in Wilmington, North Carolina, and licensed to do business in the State of North Dakota.

3. Mechanical Plant Services, Inc. ("MPS"), is an administratively dissolved North Carolina corporation that was primarily engaged in constructing and repairing turbines.

4. Qualified Plant Services, Inc., ("QPS") is an administratively dissolved North Carolina corporation that was in the business of refurbishing rail cars.

5. Lacy M. Henry is a resident of the State of North Carolina and the sole shareholder of MPSG and MPS.

6. Judy B. Henry, wife of Lacy M. Henry, is a resident of the State of North Carolina and the sole shareholder of QPS.

7. Ormat, Inc. ("Ormat") is a Delaware corporation with its principal office in the State of Nevada.

8. Clifford Waddell is a resident of the State of Michigan.

9. Mr. Waddell was originally employed by MPS.

10. After MPS' charter was suspended in 2002, Mr. Waddell became an employee of MPSG.

11. MPSG shared payroll accounts and employees with MPS and QPS.

12. On November 3, 2003, MPSG and Northern Border Pipeline Company ("Northern Border"), a Texas general partnership, entered into a Waste Heat Purchase Agreement.

13. Under the Waste Heat Purchase Agreement, MPSG acquired the rights to purchase waste heat from four compressor stations on the Northern Border Pipeline (initial sites 7, 9, 10 and 11).

14. The Waste Heat Purchase Agreement also gave MPSG an option to acquire one or more of nine remaining sites (secondary sites 1, 2, 3, 4, 5, 6, 8, 12 and 13).

15. On November 5, 2003, MPSG entered into an Engineering, Procurement and Construction Contract ("EPC Contract") with Basin, whereby MPSG agreed to furnish and install four waste heat recovery systems ("WHRS") at sites 7, 9, 10 and 11 for the purpose of generating electric power and energy ("Basin Project").

16. Mr. Henry formed MPSG for the purpose of performing the EPC Contract and related contracts with Basin.

17. John Stephens, the initial director named in MPSG's articles of incorporation, believed that MPSG lacked the money and resources to take on the project with Basin.

18. When MPSG was formed, no stock certificates were issued in exchange for capital.

19. Aside from the Northern Border heat rights and easement, MPSG had no other known assets, such as patents or equipment, that Lacy Henry could identify in his deposition.

20. MPSG did not file a tax return.

21. MPSG never conducted director meetings..

22. Grady Windham, accountant for MPSG and related entities, was unaware of

any certified audit, review or bound statement for MPSG during its existence or the related entities since 1995.

23. Mr. Henry had no knowledge of the directors and officers of MPSG.

24. Mr. Henry admitted that he was the decision maker for MPSG, including the decision maker regarding the allocation of capital.

25. Mr. Windham considered Powertec and Light Logix as "probably one and the same."

26. Most of the bookkeeping for Powertec and Light Logix was handled through MPS.

27. MPSG had no separate payroll account.

28. QPS was the administrative entity for the other corporations, and payroll checks for the separate entities were made on one account entitled "Plant Services."

29. There is little or no evidence that Judy Henry controlled MPSG.

30. At the time that MPSG contracted with Basin, Mr. Henry was aware that MPS owed $1.4 million for delinquent withholding taxes for 2002 and 2003.

31. MPS shared its employees with other related entities, such as MPSG.

32. QPS was also delinquent in the approximate amount of $1.6 million for unpaid withholding taxes for the third quarter of 2000 and for all of 2002.

33. The Henrys were delinquent on federal income taxes due from previous years.

34. MPSG assigned Basin the waste heat rights to sites 7, 9, 10 and 11 pursuant to the Partial Assignment and Assumption Agreement between Basin and MPSG dated November 5, 2003.

35. MPSG was required to complete its obligations under the EPC Contract within fourteen months of the written notice to commence construction.

36. On November 5, 2003, MPSG and Basin also entered into an Operating and Maintenance Agreement, whereby MPSG agreed to operate and maintain the waste heat recovery systems on behalf of Basin for a period of ten years.

37. Mr. Waddell was involved in the negotiation of the EPC Contract and Operating and Maintenance Contracts between Basin and MPSG.

38. The EPC Contract provided that each WHRS would include the ORMAT Energy Converter ("OEC") and balance of plant.

39. Pursuant to the EPC Contract, each OEC was to be integrated with a Waste Heat Oil Heater ("WHOH") to produce electrical power.

40. Under the EPC contract, MPSG guaranteed that each WHRS would produce 5.726 MW of net power.

41. Under the Operations and Maintenance Contract, if a WHRS failed to produce the guaranteed power, MPSG was liable to Basin for liquidated damages for the term of ten years.

42. Pursuant to the EPC Contract, Basin agreed to pay MPSG a total of $28,900,000.00 in accordance with a Milestone Payment Schedule.

43. The Milestone Payment Schedule describes the work to be completed for each milestone, the estimated time for each award, the documentation required, and the percentage of the contract price to be awarded.

44. The Milestone Payment Schedule states that the first milestone consists of a direct payment to MPSG and an amount to be placed in an escrow account.

45. Basin, MPSG, and Wells Fargo Bank entered into an Escrow Agreement.

46. Basin deposited $2,052,000.00 in the escrow account at Wells Fargo Bank as required by the EPC Contract.

47. On December 29, 2003, MPSG entered into a Supply Contract with Ormat, Inc., ("Ormat") whereby Ormat agreed to supply the process and conceptual design including the WHOH performance specifications; supply, transport, handle and insure the OECs from the port of origin to the four sites; and provide other ancillary services.

48. MPSG submitted invoices for work completed pursuant to the Milestone Payment Schedule.

49. Basin made payments to MPSG in excess of four million dollars for milestones one through four.

50. Mr. Henry authorized transfers of funds from MPSG to related entities, such as MPS, QPS, and Powertec, as well as to himself and Judy Henry.

51. There were no loan agreements between MPSG and these related entities and individuals.

52. Basin directed MPSG to acquire and assign to Basin sites 5 through 12 and paid MPSG $125,000.00 by wire transfer on March 31, 2004.

53. On April 2, 2004, Basin made the fourth milestone payment under the EPC Contract by transferring $1,300,500.00 to MPSG.

54. In April 2004, MPSG exercised its option with Northern Border and paid $437,000.00 to acquire the rights to seven of the remaining nine sites (sites 1, 3, 5, 6, 8, 12 and 13).

55. During the spring of 2004, MPSG realized that there would be a power shortfall under the EPC Contract. While MPSG had guaranteed 5.726 MW of net power under the EPC

Contract, Ormat had guaranteed 5.726 MW of "OEC power" under the Supply Contract.

56. During the spring of 2004, Basin expressed dissatisfaction with the design of the WHOH, asserting that the proposed design far exceeded standard heat exchanger design and created an acid dew risk.

57. By letter dated July 29, 2004, Basin notified MPSG that it would not accept the WHOH design.

58. Basin, MPSG and Ormat met to consider various assignments, releases, and consents that would have resulted in Ormat constructing and owning the four waste heat facilities and selling the electricity to Basin.

59. MPSG would not sign such assignments, releases, and consents.

60. MPSG did not invoice Basin for the milestone five payment.

61. MPSG invoiced Basin for the sixth milestone payment for mobilization.

62. Basin refused to make milestone payment six.

63. During the course of performing the EPC Contract, MPSG did not pay certain subcontractors and employees.

64. A number of subcontractors filed liens for nonpayment against certain sites subject to the Waste Heat Purchase Agreement between MPSG and Northern Border.

65. Perigon Architectural and Engineering Associates, P.A., obtained a money judgment against MPSG.

66. Northern Border terminated the Waste Heat Purchase Agreement with MPSG.

67. In October 2004, the Internal Revenue Service filed a notice of levy against MPS for unpaid taxes for calendar years 2002 and 2003 in the amount of $1,400,601.54.

68. MPSG did not construct any waste heat recovery systems.

69.     During the course of the project, Rany Raviv of Ormat nicknamed Mr. Waddell Pinnocchio.

70.     On August 26, 2004, Hezy Ram of Ormat sent a memorandum to L.Y. Bronicki and Dita Bronicki of Ormat, explaining that Pinnocchio was "willing to jump ship." The memorandum further stated: "I talked to him before and impressed on the fact that we would need his services throughout the project for obvious reasons. He is willing to listen and move to us with the project, but needs an answer shortly as he does not wish to stay bold."

71.     Mr. Waddell resigned from MPSG on September 30, 2004.

72.     Mr. Waddell was not paid his salary of $28,846.00 for 20 weeks (calculated for May 15, 2004 through October 1, 2004) and expenses of $19,246.00.

73.     When Waddell left MPSG, he did not tell MPSG that he was going to work for Ormat; rather, he said that he was going to work for a small company in Michigan.

74.     Mr. Waddell was officially employed by Ormat on Oct. 1, 2004.

75.     On December 12, 2004, Basin entered into a Power Purchase Agreement with an Ormat-related company, OREG 1, Inc. ("OREG 1").

76.     Under the Power Purchase Agreement, Basin assigned OREG 1 the waste heat rights to sites 7, 9, 10 and 11.

77.     OREG-1 built the sites and is now selling power to Basin.

78.     By letters dated February 8, 2005 and February 9, 2005, Basin formally gave notice that it was terminating the EPC Contract for its convenience.

79.     By the letter dated February 9, 2005, Basin demanded to audit MPSG's records.

80.     MPSG refused the audit.

81.     Upon Basin's cancellation for convenience, MPSG demanded Wells Fargo to

8

distribute all of the escrow funds to MPSG.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure is applicable to adversary proceedings. Fed. R. Bankr. P. 7056. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "When a motion for summary judgment is made and supported . . . , an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id. The facts must be viewed in the light most favorable to the non-moving party. Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## ANALYSIS

MPSG filed a third party complaint against Mr. Waddell, asserting claims of breach of fiduciary duty, tortious interference with contract, constructive fraud, and unfair or deceptive trade practices. Lacy and Judy Henry filed an identical third party complaint against Mr. Waddell in

the event they are found to be the alter ego of MPSG.[1] Mr. Waddell filed an answer and counterclaim to the third-party complaint. In his counterclaim, Mr. Waddell seeks recovery of his wages, expenses, and commissions. On summary judgment, Mr. Waddell seeks dismissal of the third-party claims against him and seeks judgment in his favor on the counterclaim.

**A.     Breach of Fiduciary Duty**

MPSG and the Henrys allege that Waddell used his position of trust and confidence to bring about the termination of the EPC Contract between MPSG and Basin, whereby Waddell benefitted financially by payment from Basin and/or Ormat or its affiliated parties. MPSG and the Henrys assert that this breach caused MPSG to suffer losses and lost profits in excess of $100,000.00.

The North Carolina Supreme Court has described the elements of a claim for breach of fiduciary duty as follows:

> For breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties. Such a relationship has been broadly defined by this Court as one in which 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . [and] 'it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.'

Harris v. Matthews, 361 N.C. 265, 284, 643 S.E.2d 566, 577-78 (2007). Generally, "the relation of employer and employee is not one of those regarded as confidential." Dalton v. Camp. 353 N.C. 647, 651 (2001).

MPSG and the Henrys take the position that Mr. Waddell was more than just an employee, as he served in the capacity of vice president of MPSG when signing the EPC Contract and Supply

---

[1] The court has granted summary judgment in favor of Judy Henry on Basin's claim of piercing the corporate veil, thus Judy Henry will not be held individually liable for MPSG's corporate debt.

Contract and served as MPSG's primary representative in communicating with Basin and Ormat regarding the Project. The scope of Mr. Waddell's position is disputed. Mr. Waddell contends that he served as vice president for the limited and isolated purpose of signing the EPC Contract and Supply Contract and was not a point person with decision-making authority. MPSG and the Henrys point to Section 55-8-42 of the North Carolina General Statutes, which states that "[a]n officer with discretionary authority shall discharge his duties under that authority: (1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner he reasonably believes to be in the best interests of the corporation." N.C. Gen. Stat. § 55-8-42. While that statutory provision addresses the manner in which an officer must discharge his duties, it does not set forth the specific duties of the corporate officer. Section 55-8-41 states "Each officer has the authority and duties set forth in the bylaws or, to the extent consistent with the bylaws, the authority and duties prescribed by the board of directors or by direction of an officer authorized by the board of directors to prescribe the authority and duties of other officers." N.C. Gen. Stat. § 55-8-41.

The court finds that there is a genuine issue of material fact regarding the specific scope of duties, if any, that Mr. Waddell allegedly breached. The court also finds that there are genuine issues of material fact regarding Mr. Waddell's conduct when communicating with Basin and Ormat while working for MPSG and whether Mr. Waddell sabotaged the EPC Contract.

The court also notes that Basin has filed a claim against Mr. Henry to pierce the corporate veil of MPSG, and the court has granted summary judgment regarding the first element of the instrumentality rule—that Mr. Henry had such control over the corporation that it had no separate

mind, will or existence of its own. If Lacy Henry is deemed to be the alter ego of MPSG, then there would be no legitimate North Carolina corporation to which an officer would owe a fiduciary duty.

Because there are genuine issues of material fact regarding this claim, the court denies summary judgment.

**B.     Tortious Interference with Contract**

MPSG and the Henrys allege that Mr. Waddell wrongfully induced Basin and Ormat to enter into an agreement that excluded MPSG. They assert that Mr. Waddell did so without justification and for his sole benefit. MPSG and the Henrys assert that Mr. Waddell's inducement led MPSG to be excluded from the Basin Project and to lose its rights under the Waste Heat Purchase Agreement, causing MPSG to suffer losses and lost profits in excess of $100,000.00.

To establish a claim of tortious interference with contract, a plaintiff must show: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." Beck v. City of Durham, 154 N.C. App. 221, 232, 573 S.E.2d 183, 191 (N.C. Ct. App. 2002).

MPSG had a valid contract with Basin which conferred contractual rights against Basin. Mr. Waddell knew of the contract. However, there are genuIne issues of material fact regarding the remaining elements of the claim. Accordingly, the court denies summary judgment as to this

claim.

C.  **Constructive Fraud**

MPSG and the Henrys assert that Waddell took advantage of his relationship of trust and confidence with MPSG for his own calculated benefit. They assert that, as a result of Mr. Waddell's conduct, MPSG was excluded from the Basin Project and lost its rights under the Waste Heat Purchase Agreement, causing MPSG to suffer losses and lost profits in excess of $100,000.00.

> The North Carolina Supreme Court has set forth the standard for constructive fraud:
>
> In order to maintain a claim for constructive fraud, plaintiffs must show that they and defendants were in a 'relation of trust and confidence ... which led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.' Constructive fraud differs from actual fraud in that 'it is based on a confidential relationship rather than a specific misrepresentation.' Implicit in the requirement that a defendant 'take advantage of his position of trust to the hurt of plaintiff' is the notion that the defendant must seek his own advantage in the transaction; that is, the defendant must seek to benefit himself.

Barger v. McCoy Hillard & Parks, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997) (internal citations omitted). "Put simply, a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty." Keener Lumber Co. v. Perry, 149 N.C. App. 19, 28, 560 S.E.2d 817, 823 (N.C. Ct. App. 2002).

As stated above when addressing the claim of breach of fiduciary duty, the court finds that there is a genuine issue of material fact regarding the specific scope of duties, if any, that Mr. Waddell allegedly breached. The court also finds that there are genuine issues of material fact regarding Mr. Waddell's conduct when communicating with Basin and

Ormat while working for MPSG and whether Mr. Waddell sabotaged the EPC Contract. If the court determines at trial that Lacy Henry is the alter ego of MPSG, then there would be no legitimate North Carolina corporation to which an officer would owe a fiduciary duty.

Based on the foregoing, the court denies summary judgment as to this claim.

**D.    Unfair or Deceptive Trade Practices**

MPSG and the Henrys assert that Mr. Waddell's actions constitute unfair or deceptive trade practices under Chapter 75 of the North Carolina General Statutes. They assert that Waddell is liable to MPSG for treble damages and attorney fees.

To establish a claim for unfair or deceptive trade practices, a plaintiff must show: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton v. Camp, 353 N.C. 647, 656 (2001). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." Id.

Waddell asserts that the claim fails because an employer-employee relationship does not fall within the intended scope of the North Carolina Unfair and Deceptive Trade Practices Act. Although "the Act does not normally extend to run-of-the-mill employment disputes," the North Carolina Supreme Court has clarified that "the mere existence of an employer-employee relationship does not in and of itself serve to exclude a party from pursuing an unfair trade or practice claim." Id. "Employers have successfully sought damages under the Act when an employee's conduct: (1) involved egregious activities outside the scope of his assigned employment duties, and (2) otherwise qualified as unfair or deceptive practices that were in or

14

affecting commerce." Id.

The court finds that there are genuine issues of material fact regarding whether Mr. Waddell engaged in an unfair or deceptive trade practice and whether his actions led to injury of MPSG. There are also genuine issues of material fact regarding whether Mr. Waddell conducted "egregious activities" under the heightened employer-employee standard. Based on the foregoing, the court denies summary judgment.

**E.      Counterclaim for Wages, Expenses, and Commissions**

Mr. Waddell seeks earned salary, reimbursement of costs and expenses, and earned commission, plus interest. Mr. Waddell filed a proof of claim in the amount of $155,510.17. This includes salary of $28,846.00 for 20 weeks (calculated for May 15, 2004 through Oct. 1, 2004), expenses of $19,246.00, commissions on the Williams Project of $6,300.00 based on 2% of receipts, commissions on the Light Logix sales of $19,910.90 based on 2% of receipts, and commissions on the Basin a/k/a Northern Border Project of $81,207.00 based on 2% of receipts.

In support of its claim, Mr. Waddell refers to the affidavit of John Stephens. In the affidavit, Mr. Stephens states that he hired Mr. Waddell and served as his immediate supervisor. Mr. Stephens agrees with Mr. Waddell's assessment of earned salary, reimbursement of costs and expenses, and earned commission, plus interest totaling $155,510.17. In its answer to Mr. Waddell's counterclaim, MPSG admits that Mr. Waddell's salary was $75,000.00 per year to be paid weekly in the amount of $1,442.31 gross plus reimbursement of expenses, but it denies that Mr. Waddell was entitled to any commission on projects.

Mr. Henry is the sole shareholder of MPSG. The court has found that Mr. Henry

15

completely controlled MPSG, as the court has granted summary judgment on the first element of the instrumentality test in favor of Basin on its claim against Mr. Henry for piercing the corporate veil of MPSG. At deposition, when asked to review Mr. Waddell's proof of claim, Mr. Henry said that he did not question Mr. Waddell's salary or expenses. Lacy Henry Deposition p. 751-52. Mr. Henry, however, disputed that Mr. Waddell was owed any commission on the Williams Project, Light Logix Project, or Basin Project, asserting that Mr. Waddell had not added commission to those projects.

The court finds that there is no genuine issue of material fact regarding whether Mr. Waddell is due his salary of $28,846.00 for 20 weeks (May 15, 2004 through Oct. 1, 2004) and expenses of $19,246.00. The court grants summary judgment as to these amounts. Payment of earned salary and reimbursable expenses will not be due until all third party claims are adjudicated. The court, however, finds that there is a genuine issue regarding whether Mr. Waddell was entitled to commission. That issue is reserved for trial.

## **CONCLUSION**

Based on the foregoing, the court denies Mr. Waddell's motion for summary judgment as to the third party claims of MPSG and the Henrys. The court grants in part Mr. Waddell's motion for summary judgment regarding his third party counterclaim.

END OF DOCUMENT