**SO ORDERED.**

**SIGNED this 19 day of September, 2007.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

IN RE:

    LACY M. HENRY and
    JUDY B. HENRY,
        Debtors.                                   Case No. 05-04620-8-JRL
                                                     Chapter 11

_____

    BASIN ELECTRIC POWER COOPERATIVE,
        Plaintiff,

    v.                                           Adversary Proceeding No.
                                                 L-05-00262-8-AP

    LACY M. HENRY; JUDY B. HENRY;
    MPS GENERATION, INC.; MECHANICAL
    PLANT SERVICES, INC.; QUALIFIED PLANT
    SERVICES, INC.;
        Defendants,

    and

    LACY M. HENRY and JUDY B. HENRY,
        Third-Party Plaintiffs,

    v.

    ORMAT, INC., and CLIFFORD WADDELL,
        Third-Party Defendants.

## ORDER

The matter before the court is the motion for summary judgment filed by Ormat, Inc. ("Ormat"), and the motion for summary judgment filed by Lacy M. Henry, Judy B. Henry, MPS Generation, Inc. ("MPSG"), Mechanical Plant Services, Inc. ("MPS"), and Qualified Plant Services, Inc. ("QPS") (hereinafter "Defendants") regarding Ormat's counterclaims against Judy Henry only. On August 22-23, 2007, the court conducted a hearing on these motions in Wilmington, North Carolina.

## UNDISPUTED FACTS

1. Basin Electric Power Cooperative ("Basin") is a North Dakota cooperative principally located in Bismarck, North Dakota, that provides electricity to its member cooperatives.

2. MPSG is a North Carolina corporation principally located in Wilmington, North Carolina, and licensed to do business in the State of North Dakota.

3. MPS is an administratively dissolved North Carolina corporation that was primarily engaged in constructing and repairing turbines.

4. QPS is an administratively dissolved North Carolina corporation that was in the business of refurbishing rail cars.

5. Lacy M. Henry is a resident of the State of North Carolina and the sole shareholder of MPSG and MPS.

6. Judy B. Henry, wife of Lacy M. Henry, is a resident of the State of North Carolina and the sole shareholder of QPS.

7. Ormat is a Delaware corporation with its principal office in the State of Nevada.

8. Clifford Waddell is a resident of the State of Michigan.

9. Mr. Waddell was originally employed by MPS.

10. After MPS' charter was suspended in 2002, Mr. Waddell became an employee of MPSG.

11. MPSG shared payroll accounts and employees with MPS and QPS.

12. On November 3, 2003, MPSG and Northern Border Pipeline Company ("Northern Border"), a Texas general partnership, entered into a Waste Heat Purchase Agreement.

13. Under the Waste Heat Purchase Agreement, MPSG acquired the rights to purchase waste heat from four compressor stations on the Northern Border Pipeline (initial sites 7, 9, 10 and 11).

14. The Waste Heat Purchase Agreement also gave MPSG an option to acquire one or more of nine remaining sites (secondary sites 1, 2, 3, 4, 5, 6, 8, 12 and 13).

15. On November 5, 2003, MPSG entered into an Engineering, Procurement and Construction Contract ("EPC Contract") with Basin, whereby MPSG agreed to furnish and install four waste heat recovery systems ("WHRS") at sites 7, 9, 10 and 11 for the purpose of generating electric power and energy ("Basin Project").

16. Mr. Henry formed MPSG for the purpose of performing the EPC Contract and related contracts with Basin.

17. John Stephens, the initial director named in MPSG's articles of incorporation, believed that MPSG lacked the money and resources to take on the project with Basin.

18. When MPSG was formed, no stock certificates were issued in exchange for capital.

19. Aside from the Northern Border heat rights and easement, MPSG had no other

known assets, such as patents or equipment, that Lacy Henry could identify in his deposition.

20. MPSG did not file a tax return.

21. MPSG never conducted director meetings..

22. Grady Windham, accountant for MPSG and related entities, was unaware of any certified audit, review or bound statement for MPSG during its existence or the related entities since 1995.

23. Mr. Henry had no knowledge of the directors and officers of MPSG.

24. Mr. Henry admitted that he was the decision maker for MPSG, including the decision maker regarding the allocation of capital.

25. Mr. Windham considered Powertec and Light Logix as "probably one and the same."

26. Most of the bookkeeping for Powertec and Light Logix was handled through MPS.

27. MPSG had no separate payroll account.

28. QPS was the administrative entity for the other corporations, and payroll checks for the separate entities were made on one account entitled "Plant Services."

29. There is little or no evidence that Judy Henry controlled MPSG.

30. At the time that MPSG contracted with Basin, Mr. Henry was aware that MPS owed $1.4 million for delinquent withholding taxes for 2002 and 2003.

31. MPS shared its employees with other related entities, such as MPSG.

32. QPS was also delinquent in the approximate amount of $1.6 million for unpaid withholding taxes for the third quarter of 2000 and for all of 2002.

33. The Henrys were delinquent on federal income taxes due from previous

years.

34. MPSG assigned Basin the waste heat rights to sites 7, 9, 10 and 11 pursuant to the Partial Assignment and Assumption Agreement between Basin and MPSG dated November 5, 2003.

35. MPSG was required to complete its obligations under the EPC Contract within fourteen months of the written notice to commence construction.

36. On November 5, 2003, MPSG and Basin also entered into an Operating and Maintenance Agreement, whereby MPSG agreed to operate and maintain the waste heat recovery systems on behalf of Basin for a period of ten years.

37. Mr. Waddell was involved in the negotiation of the EPC Contract and Operating and Maintenance Contracts between Basin and MPSG.

38. The EPC Contract provided that each WHRS would include the ORMAT Energy Converter ("OEC") and balance of plant.

39. Pursuant to the EPC Contract, each OEC was to be integrated with a Waste Heat Oil Heater ("WHOH") to produce electrical power.

40. Under the EPC contract, MPSG guaranteed that each WHRS would produce 5.726 MW of net power.

41. Under the Operations and Maintenance Contract, if a WHRS failed to produce the guaranteed power, MPSG was liable to Basin for liquidated damages for the term of ten years.

42. Pursuant to the EPC Contract, Basin agreed to pay MPSG a total of $28,900,000.00 in accordance with a Milestone Payment Schedule.

43. The Milestone Payment Schedule describes the work to be completed for each milestone, the estimated time for each award, the documentation required, and the percentage of

the contract price to be awarded.

44. The Milestone Payment Schedule states that the first milestone consists of a direct payment to MPSG and an amount to be placed in an escrow account.

45. Basin, MPSG, and Wells Fargo Bank entered into an Escrow Agreement.

46. Basin deposited $2,052,000.00 in the escrow account at Wells Fargo Bank as required by the EPC Contract.

47. On December 29, 2003, MPSG entered into a Supply Contract with Ormat, whereby Ormat agreed to supply the process and conceptual design including the WHOH performance specifications; supply, transport, handle and insure the OECs from the port of origin to the four sites; and provide other ancillary services.

48. MPSG submitted invoices for work completed pursuant to the Milestone Payment Schedule.

49. Basin made payments to MPSG in excess of four million dollars for milestones one through four.

50. Mr. Henry authorized transfers of funds from MPSG to related entities, such as MPS, QPS, and Powertec, as well as to himself and Judy Henry.

51. There were no loan agreements between MPSG and these related entities and individuals.

52. Basin directed MPSG to acquire and assign to Basin sites 5 through 12 and paid MPSG $125,000.00 by wire transfer on March 31, 2004.

53. On April 2, 2004, Basin made the fourth milestone payment under the EPC Contract by transferring $1,300,500.00 to MPSG.

54. In April 2004, MPSG exercised its option with Northern Border and paid

$437,000.00 to acquire the rights to seven of the remaining nine sites (sites 1, 3, 5, 6, 8, 12 and 13).

55. During the spring of 2004, MPSG realized that there would be a power shortfall under the EPC Contract. While MPSG had guaranteed 5.726 MW of net power under the EPC Contract, Ormat had guaranteed 5.726 MW of "OEC power" under the Supply Contract.

56. During the spring of 2004, Basin expressed dissatisfaction with the design of the WHOH, asserting that the proposed design far exceeded standard heat exchanger design and created an acid dew risk.

57. By letter dated July 29, 2004, Basin notified MPSG that it would not accept the WHOH design.

58. Basin, MPSG and Ormat met to consider various assignments, releases, and consents that would have resulted in Ormat constructing and owning the four waste heat facilities and selling the electricity to Basin.

59. MPSG would not sign such assignments, releases, and consents.

60. MPSG did not invoice Basin for the milestone five payment.

61. MPSG invoiced Basin for the sixth milestone payment for mobilization.

62. Basin refused to make milestone payment six.

63. During the course of performing the EPC Contract, MPSG did not pay certain subcontractors and employees.

64. A number of subcontractors filed liens for nonpayment against certain sites subject to the Waste Heat Purchase Agreement between MPSG and Northern Border.

65. Perigon Architectural and Engineering Associates, P.A., obtained a money judgment against MPSG.

66. Northern Border terminated the Waste Heat Purchase Agreement with MPSG.

67. In October 2004, the Internal Revenue Service filed a notice of levy against MPS for unpaid taxes for calendar years 2002 and 2003 in the amount of $1,400,601.54.

68. MPSG did not construct any waste heat recovery systems.

69. During the course of the project, Rany Raviv of Ormat nicknamed Mr. Waddell Pinnocchio.

70. On August 26, 2004, Hezy Ram of Ormat sent a memorandum to L.Y. Bronicki and Dita Bronicki of Ormat, explaining that Pinnocchio was "willing to jump ship." The memorandum further stated: "I talked to him before and impressed on the fact that we would need his services throughout the project for obvious reasons. He is willing to listen and move to us with the project, but needs an answer shortly as he does not wish to stay bold."

71. Mr. Waddell resigned from MPSG on September 30, 2004.

72. When Waddell left MPSG, he did not tell MPSG that he was going to work for Ormat; rather, he said that he was going to work for a small company in Michigan.

73. Mr. Waddell was officially employed by Ormat on Oct. 1, 2004.

74. In October 2004, the Internal Revenue Service filed a notice of levy against MPS for unpaid taxes for calendar years 2002 and 2003 in the amount of $1,400,601.54.

75. On October 29, 2004, Ormat sent a letter cancelling the Supply Contract.

76. On December 12, 2004, Basin entered into a Power Purchase Agreement with an Ormat-related company, OREG 1, Inc. ("OREG 1").

77. Under the Power Purchase Agreement, Basin assigned OREG 1 the waste heat rights to sites 7, 9, 10 and 11.

78. OREG-1 built the sites and is now selling power to Basin.

79.     By letters dated February 8, 2005 and February 9, 2005, Basin formally gave notice that it was terminating the EPC Contract for its convenience.

80.     By the letter dated February 9, 2005, Basin demanded to audit MPSG's records.

81.     MPSG refused the audit.

82.     Upon Basin's cancellation for convenience, MPSG demanded Wells Fargo to distribute all of the escrow funds to MPSG, but Basin filed a case in U.S. District Court for the District of North Dakota and obtained a preliminary injunction to prevent that from happening.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure is applicable to adversary proceedings. Fed. R. Bankr. P. 7056. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "When a motion for summary judgment is made and supported . . . , an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id. The facts must be viewed in the light most favorable to the non-moving party. Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

# ANALYSIS

MPSG alleges third party claims against Ormat for breach of contract / breach of warranty, tortious interference with contract, unfair or deceptive trade practices under Chapter 75 of the North Carolina Statutes, and fraud. Lacy and Judy Henry allege identical third party claims against MPSG in the event they are determined to be the alter ego of MPSG. [1] Ormat asserts third party counterclaims against MPSG for breach of contract, negligent mispresentation, intentional misrepresentation, and unfair or deceptive trade practices under Chapter 75 of the North Carolina statutes. Ormat alleges identical third party counterclaims against the Henrys in the event they are found to be the alter ego of MPSG. Ormat also alleges claims against the Henrys for exception to discharge, pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).

Ormat seeks summary judgment on each of its counterclaims against MPSG and the Henrys. In addition, Ormat seeks dismissal of each of the third-party claims against it brought by MPSG and the Henrys. The Defendants seek summary judgment on Ormat's counterclaims against Judy Henry only.

## MPSG/Henrys' Claim of Breach of Contract / Breach of Warranty

MPSG asserts that Ormat breached the Supply Contract by failing to design and provide OECs and related equipment that conformed to the specifications of the EPC Contract and Supply Contract causing MPSG to suffer losses in excess of four million dollars. Ormat denies that it failed to meet any performance specifications and asserts that the sites that OREG 1 eventually built produce in excess of 5.726 MW net power to the grid. Ormat contends that

---

[1] Basin's claim against Judy Henry for piercing the corporate veil of MPSG has been eliminated on summary judgment. Judy Henry is, therefore, not the alter ego of MPSG.

MPSG is bound by the termination for convenience provision in the EPC Contract with Basin; therefore, Ormat asserts that MPSG should not be allowed to claim lost profits and other consequential damages against Ormat under a breach of contract theory.

The termination for convenience provision in the EPC Contract limits Basin's liability for MPSG's damages, not Ormat's. Moreover, a genuine issue of material fact remains regarding whether Basin terminated the EPC Contract for convenience in bad faith. If that can be proven at trial, then MPSG's contractual damages under the EPC Contract would not be limited by the termination for convenience provision.

The elements of breach of contract are: (1) the existence of a valid contract; and (2) the breach of the terms of that contract. Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). The court finds that there are genuine issues of material fact regarding whether Ormat breached the terms of the Supply Contract. Summary judgment is denied as to this claim.

**MPSG/Henrys' Claim of Tortious Interference with Contract**

The court denies summary judgment as to the claim of tortious interference with contract. To establish a claim of tortious interference with contract, a plaintiff must show: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." Beck v. City of Durham, 154 N.C. App. 221, 232, 573 S.E.2d 183, 191 (N.C. Ct. App. 2002). Genuine issues of material fact remain regarding whether Ormat intentionally induced Basin to not perform its contracts with MPSG, whether that was done without justification, and whether Ormat's conduct caused actual pecuniary harm to MPSG.

**MPSG/Henrys' Claim of Unfair or Deceptive Trade Practice**

The court denies summary judgment as to the claim of unfair or deceptive trade practices pursuant to Chapter 75 of the North Carolina General Statutes. To establish a claim for unfair or deceptive trade practices, a plaintiff must show: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton v. Camp, 353 N.C. 647, 656 (2001). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." Id. The court finds that there are disputed issues of fact regarding the elements of this claim.

**MPSG/Henrys' Claim of Fraud**

The court denies summary judgment as to the claim of fraud. The elements of fraud are: (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in fact deceive and (5) resulting in damage to the injured party. Food Lion, LLC v. Schuster Marketing Corp., 382 F. Supp. 2d 793, 797 (E.D.N.C. 2005). The court finds that there are genuine issues of material fact regarding this claim.

**Ormat's Counterclaim for Breach of Contract, Negligent Misrepresentation, Intentional Misrepresentation, and Unfair or Deceptive Trade Practices**

Based on the record, the court finds that there are genuine issues of material fact regarding Ormat's counterclaims of breach of contract, negligent misrepresentation, intentional misrepresentation, and unfair or deceptive trade practices against MPSG and Lacy Henry only. The court denies Ormat's motion for summary judgment as to these claims against MPSG and Lacy Henry.

The court denies Ormat's motion for summary judgment and grants the Defendants' motion for summary judgment regarding these claims against Judy Henry, as they were brought against her in the event she was found to be the alter ego of MSPG. The court, however, ruled in favor of Judy Henry on Basin's claim for piercing the corporate veil. Thus, the court found that Judy Henry was not the alter ego of MPSG.

**Ormat's Counterclaim for Exception to Discharge**

Ormat asserts claims that Lacy and Judy Henrys' debt should be excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). The court denies summary judgment as to these dischargeability claims, as there are genuine issues of material fact regarding both Lacy and Judy Henry's intent and conduct.

## CONCLUSION

Based on the foregoing, the court denies Ormat's motion for summary judgment as to the third party claims and counterclaims. The court grants the Defendants' motion for summary judgment as to the counterclaims of breach of contract, negligent misrepresentation, intentional misrepresentation, and unfair or deceptive trade practices against Judy Henry only. The court denies the Defendants' motion for summary judgment as to Ormat's counterclaims for exception to discharge against Judy Henry.

END OF DOCUMENT